FILED

2025 Oct-21  AM 08:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM RHINESMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **JESSE COBB,** | ) | **Case No.:** |
| **SAMUEL DIAL,** | ) | |
| **JOHN Q. HAMM,** | ) | **JURY TRIAL DEMANDED** |
| **GREG LOVELACE,** | ) | |
| **WENDY WILLIAMS,** | ) | |
| **LAGRETA MCCLAIN,** | ) | |
| **EDWARD ELLINGTON,** | ) | |
| **CHADWICK CRABTREE,** | ) | |
| **DEBORAH TONEY,** | ) | |
| **and** | ) | |
| **WILLIAM STREETER,** | ) | |
| *in their individual capacities*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff William Rhinesmith brings this action against Defendants Jesse Cobb, Samuel Dial, John Q. Hamm, Greg Lovelace, Wendy Williams, LaGreta McClain, Edward Ellington, Chadwick Crabtree, Deborah Toney, and William Streeter under 42 U.S.C. § 1983 for violations of his constitutional rights. All defendants are sued in their individual capacities. Plaintiff alleges as follows:

### INTRODUCTION

On October 19, 2023, Limestone Correctional Officers Jesse Cobb and Samuel Dial ordered 75-year-old prisoner William "Bill" Rhinesmith to follow them out of his dorm to an area obscured from the view of surveillance cameras. There, Cobb and Dial punched, kicked, and beat Bill with a broom handle until he lost consciousness, continuing to beat him after he was

unconscious. They beat Bill so badly that other inmates carried him, still unconscious, away from the scene of the beating and wheeled him to the infirmary. Bill nearly died from a brain bleed caused by the beating.

Bill's horrific beating was merely one of many excessive-force incidents across the ADOC and at Limestone specifically. At the time of his attack, there was already a widespread and well-known history of ADOC correctional officers using excessive force against prisoners—often against prisoners who, like Bill, did not resist and exhibited no threat. Despite the frequency and magnitude of these excessive-force incidents, the ADOC supervisory officials who had the ability and authority to stop uses of excessive force failed to take any corrective action to do so.

Bill's beating was the result of the cruelty, malice, and sadism of the individual officers who beat him. It was also the result of the deliberate indifference of supervisors who could have prevented such known and egregious constitutional violations, but chose, instead, to take no action.

## JURISDICTION AND VENUE

1.      Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights conferred by the Eighth Amendment to the United States Constitution.

2.      This Court has subject-matter jurisdiction over Plaintiff's constitutional claims under 28 U.S.C. §§ 1331 and 1343(a).

3.      This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

2

## PARTIES

### *Plaintiff*

5.      **Plaintiff William Rhinesmith** is incarcerated within the Alabama Department of Corrections ("ADOC" or "Department") at Kilby Correctional Facility in Montgomery County, Alabama. At the time he was beaten by Defendants Cobb and Dial, Plaintiff was incarcerated at Limestone Correctional Facility ("Limestone") in Limestone County, Alabama.

### *The Defendant Correctional Officers*

6.      **Defendant Jesse Cobb** was a Senior Correctional Officer at Limestone at all times relevant to this Complaint. Upon information and belief, he retired, resigned, or was fired from employment with the ADOC in or about May 2024. As a Senior Correctional Officer, Defendant Cobb was responsible for the safety and security of the prisoners at Limestone, including monitoring and supervising the prisoners and protecting them from harm. Defendant Cobb had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

7.      **Defendant Samuel Dial** was a Senior Correctional Officer at Limestone at all times relevant to this Complaint. Upon information and belief, he retired, resigned, or was fired from employment with the ADOC in or about July 2024. As a Senior Correctional Officer, Defendant Dial was responsible for the safety and security of the prisoners at Limestone, including monitoring and supervising the prisoners and protecting them from harm. Defendant Dial had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

### *The Supervisory Defendants*

8.      **Defendant John Q. Hamm** is the Commissioner of the ADOC, the state agency that administers the prison system in Alabama. He has held that position since January 1, 2022,

and he held that position at all times relevant to this Complaint. As Commissioner, Defendant Hamm is the highest-ranking official in the ADOC, and he is responsible for the direction, supervision, and control of the ADOC and its employees. Defendant Hamm personally supervises the activities of the ADOC, and he is responsible for ensuring that ADOC employees are properly trained to perform their assigned duties and properly carry out their assigned duties. He is responsible for setting departmental policies and customs at the ADOC and its facilities; overseeing institutional policies and customs at ADOC facilities; supervising and approving the adoption of changes in departmental and institutional policies and customs; and planning, directing, controlling, and otherwise managing ADOC facilities, to ensure the safety and security of all ADOC prisoners. He has the duty, ability, and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary to address any associated issues. As Commissioner, Defendant Hamm is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

9.     **Defendant Greg Lovelace** is the Chief Deputy Commissioner of Corrections of the ADOC. He has held that position since in or about May 2022, and he held that position at all times relevant to this Complaint. As Chief Deputy Commissioner, Defendant Lovelace is responsible for the management and oversight of all operations and administrative divisions of the ADOC and its facilities. Defendant Lovelace personally supervises the activities of the ADOC, and he is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the prison system in Alabama, and for ensuring the effective and safe daily operations of all ADOC facilities. He has the duty, ability, and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary to address any associated issues. As Chief Deputy Commissioner, Defendant

4

Lovelace is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

10.    **Defendant Wendy Williams** was the Deputy Commissioner of Men's Services for the ADOC at the time of the events that form this basis of this Complaint. She held that position from on or about January 6, 2022, until in or about September 2024. As Deputy Commissioner, Defendant Williams was responsible for ensuring the effective and safe daily operations of all the facilities under her supervision, including Limestone. She reported directly to Defendants Hamm and Lovelace, and she was the point person on the Department's administrative team regarding institutional security issues, including all use-of-force incidents and all uses of excessive force. As Deputy Commissioner, Defendant Williams oversaw all aspects of institutional security at the facilities under her supervision. This oversight included, among other things: reviewing use-of-force reports and investigations; reviewing facility policies and practices related to use-of-force incidents, investigations, and associated disciplinary actions; reviewing internal audit reports; reviewing facility staffing plans and overseeing facility staffing; reviewing personnel training records and practices; and monitoring and overseeing facility leadership at the facilities under her supervision to ensure compliance with all directions, regulations, and policies. Defendant Williams was responsible for addressing use-of-force incidents, including all uses of excessive force, and she had the duty, ability, and authority to suggest or require modifications to institutional policies and practices and to implement or supervise such changes as necessary to address any associated issues. As Deputy Commissioner, Defendant Williams was a final policymaker for the Department and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

11.     **Defendant Lagreta McClain** is a Regional Director for the ADOC. She has held that position since in or about June 2023, and she held that position at all times relevant to this Complaint. As Regional Director, Defendant McClain oversees six facilities, including Limestone, and reports to Deputy Commissioner Williams relating to male facilities. Defendant McClain is responsible for planning, monitoring, and reviewing the day-to-day operations of Limestone. Her duties include supervising Limestone's wardens; serving as a liaison between Limestone and ADOC executive leadership; ensuring safe conditions at Limestone; and leading the external security audit team. Defendant McClain maintains frequent contact with Limestone's wardens. She also receives daily or near-daily reports from Limestone; is notified of all urgent and emergent incidents, including uses of force and uses of excessive force; and receives and reviews staffing reports, audit reports, and suggested corrective action reports. Defendant McClain reviews and approves or disapproves requests for disciplinary actions against ADOC personnel at Limestone, including all requests for corrective actions, before those requests are escalated to Defendant Williams. Defendant McClain has the duty, ability, and authority to suggest or require modifications to policies and practices at Limestone and to implement or supervise such changes as necessary to address any associated issues. As Regional Director, Defendant McClain is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the facilities she oversees. She is sued in her individual capacity.

12.     **Defendant Edward Ellington** is a Regional Director for the ADOC. He has held that position since in or about 2017. Until in or about June 2023, when Defendant McClain took over as Regional Director overseeing Limestone, Defendant Ellington oversaw Limestone as Regional Director. As the Regional Director over Limestone, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of Limestone, including

supervising Limestone's wardens; serving as a liaison between Limestone and ADOC executive leadership; and ensuring safe conditions at Limestone. As the Regional Director over Limestone, Defendant Ellington maintained frequent contact with Limestone's wardens. He also received daily or near-daily reports from Limestone; was notified of all urgent and emergent incidents at Limestone, including uses of force and uses of excessive force; and received and reviewed Limestone's staffing reports, audit reports, and suggested corrective action reports. Defendant Ellington also approved or disapproved requests for disciplinary actions against ADOC personnel at Limestone, including all requests for corrective actions, before those requests were escalated to Defendant Williams. He had the duty, ability, and authority to suggest or require modifications to policies and practices at Limestone and to implement or supervise such changes as necessary to address any associated issues. As Regional Director, Defendant Ellington is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the facilities he oversees. He is sued in his individual capacity.

13.    **Defendant Chadwick Crabtree** became Correctional Warden III ("CWIII"), the head warden, of Limestone in or around May 2022, and he held that position until in or around May 2024. Defendant Crabtree reported directly to Limestone's Regional Director, either Defendant McClain or Defendant Ellington. As CWIII, Defendant Crabtree was responsible for all day-to-day operations of Limestone; the safety and security of all prisoners there; and the supervision, discipline, and training of all Limestone employees. He was responsible for adequately and appropriately monitoring, investigating, disciplining, and deterring staff misconduct, including deterring inappropriate or excessive uses of force; he was also responsible for ensuring the adequate supervision and monitoring of prisoners. He was responsible for creating, reviewing, revising, and approving all of Limestone's standard operating procedures ("SOPs"); managing, monitoring, and supervising all of Limestone's operations and personnel; and reviewing

7

and approving all proposed staffing plans. He reviewed and approved all use-of-force reports, incident reports, shift officer reports, staffing reports, audit reports, and suggestions for corrective action; and he also remained aware of trends at Limestone, including trends related to uses of force and uses of excessive force. He investigated uses of force and uses of excessive force; made recommendations for disciplinary or corrective actions related to uses of force; made recommendations about whether to involve the ADOC's Law Enforcement Services Division ("LESD") in any investigation; and sent those recommendations to the Regional Director at the time. Defendant Crabtree received and reviewed the use-of-force investigations conducted by other members of Limestone's facility leadership, and he approved or disapproved any suggestions to impose disciplinary or corrective actions and/or forward to LESD for further investigation. Before becoming CWIII at Limestone, Defendant Crabtree was Correctional Warden II ("CWII"), an assistant warden, at Limestone beginning in or around February 1, 2022. As CWII, Defendant Crabtree had all the responsibilities and authorities that Defendant Streeter had as CWII, described in Paragraph 15 below. As both CWIII and CWII, Defendant Crabtree was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

14.     **Defendant Deborah Toney** was CWIII of Limestone from in or around 2019 until in or around March 2022, and she reported directly to Defendant Ellington. As CWIII, Defendant Toney was responsible for all day-to-day operations of Limestone; the safety and security of all prisoners there; and the supervision, discipline, and training of all Limestone employees. She was responsible for adequately and appropriately monitoring, investigating, disciplining, and deterring staff misconduct, including deterring inappropriate or excessive uses of force; she was also responsible for ensuring the adequate supervision and monitoring of prisoners. Defendant Toney was responsible for creating, reviewing, revising, and approving all of Limestone's standard

8

operating procedures ("SOPs"); managing, monitoring, and supervising all of Limestone's operations and personnel; and reviewing and approving all proposed staffing plans. She reviewed and approved all use-of-force reports, incident reports, shift officer reports, staffing reports, audit reports, and suggestions for corrective action; and she also remained aware of trends at Limestone, including trends related to uses of force and uses of excessive force. She investigated uses of force and uses of excessive force; made recommendations for disciplinary or corrective actions related to uses of force; made recommendations about whether to involve the LESD in any investigation; and sent those recommendations to Defendant Ellington. She reviewed use-of-force investigations conducted by other members of Limestone's facility leadership, and she approved or disapproved any suggestions to impose disciplinary or corrective actions and/or forward to LESD for further investigation. As CWIII, Defendant Toney was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. She is sued in her individual capacity.

15.    **Defendant William Streeter** was CWII at Limestone beginning in or about August 2023, and he held that position until after the events that form the basis of this Complaint. As CWII, Defendant Streeter was responsible for the day-to-day operations of Limestone, the safety and security of all prisoners there, and the supervision of all subordinate employees. He was also responsible for reviewing and assessing use-of-force incidents and investigations at Limestone; making recommendations for disciplinary or corrective actions related to uses of force; and making recommendations about whether to involve LESD in any investigation. As CWII, Defendant Streeter had the ability and authority to implement changes in Limestone's policies and practices related to, among other things, security personnel on-the-job training, supervision, and discipline. Before becoming CWII, Defendant Streeter was Correctional Warden I ("CWI"), an assistant warden, at Limestone beginning on or about May 16, 2020. As CWI, Defendant Streeter's

responsibilities and authorities were substantially similar to his responsibilities as CWII. As both CWII and CWI, Defendant Streeter was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### *Plaintiff's Beating*

16.     Plaintiff William "Bill" Rhinesmith is a 76-year-old first-time offender.

17.     Bill entered the ADOC on July 24, 2023. After about two months in the ADOC's intake facility, he was transferred to Limestone Correctional Facility.

18.     At Limestone, Bill was assigned to B-dorm, a dorm generally reserved for older prisoners. Bill was 75 years old at the time.

19.     B-dorm, like most of Limestone's dorms, has a "cube"—a small room inside the dorm with windows that provide a view of most of the dorm. Usually, one officer, the "cube officer," is stationed inside the cube. Cube officers generally are not allowed to leave the cube during their shifts.

20.     Upon information and belief, Officer Heidi Tucker was the cube officer in B-dorm during the events described below.

21.     On or about October 19, 2023, Limestone security staff was conducting a Master Roster Count. A Master Roster Count is done to verify that each prisoner is on his assigned rack or in his assigned cell, rather than merely present in the facility.

22.     At approximately 2:00 p.m. that day, Defendants Cobb and Dial, along with one other correctional officer, entered B-dorm to conduct the Master Roster Count of B-dorm residents.

23.     As Defendants Cobb and Dial entered B-dorm to begin the Master Roster Count, they instructed several inmates to place tables against one of B-dorm's inside walls, immediately in front of the windows that looked outside the dorm. Tables are not normally placed there—during a Master Roster Count or at any other time. The placement of these tables prevented inmates in B-dorm from seeing outside.

24.     As Defendants Cobb and Dial walked throughout B-dorm conducting the count, one of them stopped at Bill's rack. Bill was sitting on his assigned rack, as he had been instructed to do during the Master Roster Count.

25.     This officer (either Defendant Cobb or Defendant Dial) asked to see Bill's inmate ID card. Bill showed it to him. The officer (either Defendant Cobb or Defendant Dial) asked Bill what crime he had been convicted of. Bill said that he had downloaded an illegal video. The officer said, "Child porn?" Bill responded, "I guess."

26.     The officer (either Defendant Cobb or Defendant Dial) left Bill's rack and continued to conduct the Master Roster Count.

27.     A few minutes later, the same officer returned to Bill's rack. He told Bill, "Come with me," and led him outside of B-dorm. The other Defendant Correctional Officer, either Defendant Cobb or Defendant Dial, followed.

28.     Bill did not protest, ask any questions, or give any indication, either verbal or physical, of resisting the officer's instructions. Even during his short time incarcerated, Bill had learned to answer any question posed directly to him, but to otherwise stay quiet. He had also learned to follow all instructions.

29.     During the Master Roster Count on this day, unlike during most Master Roster Counts, runners (inmates who assist ADOC personnel with various tasks) had been told to help

11

correctional staff conduct the count. Because they were helping officers with the count, no inmate runners were in the yard outside B-dorm, as they ordinarily would have been.

30. Thus, as Defendants Cobb and Dial led Bill outside of B-dorm, the yard was cleared of witnesses and obscured from the view of inmates inside B-dorm.

31. Once outside of B-dorm, Defendants Cobb and Dial took Bill around a corner to an area that, upon information and belief, is outside the range of Limestone's surveillance cameras— a fact that is well known by Limestone's correctional staff.

32. After directing Bill to this area, one of the officers—either Defendant Cobb or Defendant Dial—hit Bill in the face with a closed fist. He then told Bill to "Turn and face the wall." Bill complied.

33. As Bill faced the wall, Defendant Cobb and Defendant Dial started to beat him, hitting him repeatedly with their hands; kicking him; and beating him with a broom handle. During the initial part of the beating, either Defendant Cobb or Defendant Dial said to Bill, "Don't look at me, you look at the wall. If you tell anybody, I will kill you."

34. Bill passed out after the third or fourth time he was hit.

35. Bill regained consciousness sitting in a chair in the barber-shop area inside B-dorm. He was bleeding from his ears, and he could not stand or walk. There was blood pooled on the ground outside of B-dorm.

36. Officer Tucker, the cube officer, called Limestone's infirmary to have Bill taken for medical treatment. An inmate put Bill in a wheelchair and took him to the infirmary.

37. Healthcare staff in the infirmary sent Bill to Huntsville Hospital.

38. Bill was admitted to Huntsville Hospital at 5:41 p.m. The hospital conducted a CT scan, which revealed a small amount of bleeding on his brain. He had a cut on his left ear; an

auricular hematoma on each of his ears (a collection of blood on the outer ear, which is typically caused by blunt force trauma); his ears were severely swollen; and he had a broken tooth.

39.    Bill was discharged from Huntsville Hospital two days later, on October 21, 2023. Huntsville Hospital ordered a follow-up neurosurgery appointment within one month.

40.    By the time Bill left Huntsville Hospital, his right eye was swollen shut; both of his eyes were black; he had cuts and bruises over much of his body; his back, side, chest, and abdomen were bruised and tender; he could barely hear because his ears were so swollen; and he could not walk more than several steps without getting dizzy.

41.    He was sent to the prison's infirmary, where he stayed for several weeks.

42.    Bill was eventually transferred from Limestone to Kilby Correctional Facility in Montgomery, Alabama.

43.    Upon information and belief, Bill was never sent to the follow-up neurology appointment that Huntsville Hospital had ordered.

44.    After arriving at Kilby, Bill continued to have serious physical complications from the beating. He experienced debilitating headaches, hearing loss, memory loss, ongoing vertigo and dizziness, and numerous symptoms consistent with post-traumatic stress disorder.

45.    In late December 2023, Bill's physical condition worsened significantly. At first, he had difficulty lifting his feet. Soon, he was unable to walk and nearly unable to move at all.

46.    For approximately two weeks, Bill, his family, and other inmates tried to get the facility medical staff to address his symptoms. Bill submitted several requests for medical attention; inmates in Bill's dorm reported his physical conditions several times; and Bill's family called the facility repeatedly asking that he be medically evaluated. The medical staff refused to evaluate or treat Bill, and his physical condition continued to decline.

47.     On December 27, 2023, approximately two weeks after Bill first lost full movement in his legs, he was taken offsite to Jackson Hospital.

48.     At Jackson Hospital, Bill was diagnosed with a bilateral subdural hematoma—blood between the brain and the skull on both sides of his head, usually caused by traumatic injury. He underwent a bilateral craniotomy (a surgical procedure in which two sections of his skull were removed, one on either side), and metal plates were implanted on either side of his head. He was discharged from the hospital on January 3, 2024, and sent to the infirmary at Kilby.

49.     Bill's physical condition improved, but very slowly. As a result, he remained in the Kilby infirmary recovering for months.

50.     Bill continues to experience ongoing physical and emotional distress from his assault. He has hearing problems, memory problems, and vision problems. He has periodic severe headaches, dizziness, vertigo, and nausea. He is not always able to walk on his own. He suffers from severe anxiety and hypervigilance, and he has flashbacks, nightmares, and intrusive thoughts.

### The Widespread History of Excessive Force Throughout the ADOC

51.     Bill's beating was one of many excessive-force incidents throughout the ADOC in recent years. Indeed, the ADOC has a long history of using excessive force against those entrusted to its care.

52.     In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions inside Alabama's prisons for men. The investigation focused on many things, including whether Alabama's prisoners are adequately protected from excessive force by correctional officers.[1]

---

[1] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at*

53.     To investigate the prevalence of excessive force across the ADOC, the DOJ: (1) conducted site visits at four of Alabama's prisons; (2) interviewed dozens of ADOC employees, including wardens, captains, medical and mental-health staff, and high-ranking ADOC officials; (3) spoke with prisoners and their family members; and (4) reviewed hundreds of thousands of pages of the ADOC's own documents related to uses of force and employee discipline between 2015 and 2019.

54.     After completing its investigation, the DOJ published a report in July 2020 that documented its findings about the use of excessive force throughout the ADOC (the "July 2020 Report").[2]

55.     The DOJ found that there was "reasonable cause to believe that the correctional officers within the [ADOC] frequently use excessive force on prisoners housed throughout Alabama's prisons for men"; that the use of excessive force was "pervasive" and "pursuant to a pattern or practice"; and that "[t]he systemic use of excessive force within Alabama's prisons for men violates the Eighth Amendment."[3]

56.     The DOJ identified several specific ways in which the ADOC's correctional officers frequently use excessive force against prisoners in a number of unconstitutional ways. It found that officers:

        a.      "[U]se force in the absence of a physical threat," including against "restrained or compliant" prisoners.[4]

---

https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[2] U.S. Dep't of Justice, *Investigation of Alabama's State Prisons for Men* (July 23, 2020) ("July 2020 Report"), *available at* https://www.justice.gov/crt/case-document/file/1297031/dl.

[3] *Id.* at 1, 7.

[4] *Id.* at 20.

b.      "[U]se force to punish prisoners when the prisoner's response or behavior may not accord with the officer's commands, even though the prisoner does not physically resist or present a reasonably perceived threat to others."[5]

c.      "[U]se chemical spray inappropriately. Prisoners who do not present a danger are frequently sprayed with chemical agents. . . . Chemical spray is regularly used as retribution."[6]

57.     The July 2020 Report included many specific examples of the "frequent uses of excessive force" the DOJ identified throughout the ADOC to illustrate the "nature of the violations" and the "variety of circumstances in which . . . violation[s] occur[red]."[7] There have also been many, many more uses of excessive force throughout the ADOC that the DOJ did not include in its report.

58.     The following are examples of excessive-force incidents that have occurred throughout the ADOC since 2017, some of which were included in the July 2020 Report:

59.     In September 2017, a sergeant at Ventress kicked a handcuffed prisoner experiencing a medical emergency in the stomach and chest as the prisoner writhed on the floor. Another sergeant joined in, repeatedly hitting the prisoner in the genitals with a shoe.

60.     In April 2018, two officers beat a handcuffed prisoner at Ventress, punching him in the jaw and causing a bone fragment to break through his gums.

61.     In July 2018, a handcuffed prisoner being transported to the prison's infirmary at Staton stuck his tongue out at a sergeant. The sergeant punched the prisoner in the face.

---

[5] *Id.* at 14.

[6] *Id.* at 15.

[7] *Id.* at 1, 5.

62.    In September 2018, a prisoner at Ventress accidentally dropped his food tray. An officer slapped him so hard that he temporarily lost hearing in one ear.

63.    In October 2018, a prisoner at Ventress fled his dorm after an altercation with several other prisoners. He found an officer and asked for help; the officer told him to return to the dorm. When the prisoner begged the officer not to make him go back, a sergeant approached, screamed at the prisoner, and slapped him in the face.

64.    In November 2018, officers at Bibb punched and kicked a prisoner whom they suspected of possessing contraband. One officer picked the prisoner up over his head and slammed him onto a wooden bench, breaking his hip.

65.    In November 2018, a prisoner in the medical unit at Ventress was beaten by multiple officers, inducing a seizure. Other prisoners observing the beating protested, so the officers dragged the man into another room, chained him to a bed, and continued to beat him for several hours.

66.    In February 2019, a sergeant at Elmore snatched a handcuffed prisoner off a bed, shoved him against a wall, and knocked him to the floor. The sergeant punched, kicked, and hit the prisoner with a baton so severely that the prisoner defecated himself. The sergeant then grabbed a second handcuffed prisoner, repeatedly hit him with a baton and kicked him. Four other ADOC employees, including a lieutenant, watched the beatings or were nearby, but did not intervene.

67.    In 2019, an officer handcuffed a prisoner to a fence and beat him.

68.    In January 2020, a group of officers beat a man imprisoned at Ventress until he lost consciousness. When he woke up, they beat him unconscious again.

69.    In 2022, a lieutenant repeatedly beat and kicked a handcuffed prisoner at Donaldson, eventually beating him with a shoe.

17

70.     There have also been multiple, widely publicized, incidents in which an officer or officers' use of force has killed the prisoner.

71.     In October 2019, a prisoner at Donaldson rushed at a correctional officer with weapons. The prisoner was subdued and pushed face-down onto the ground. The prisoner was no longer a threat, but the officers continued beating him. The prisoner was ultimately airlifted to a hospital. He died from injuries related to the beating, including multiple fractures to his skull and extensive brain bleeding.

72.     In November 2019, correctional officers at Ventress intervened in an argument between prisoners over a bag of coffee. While escorting one of the prisoners away, officers hit the prisoner and then beat him with a chair until he passed out. Officers then dragged his body into a supply closet and continued beating him. The prisoner was taken to an outside hospital, where he died of a traumatic brain injury caused by blunt force trauma.

73.     In January 2023, a captain at Ventress dragged a prisoner into a hallway and punched him, then handcuffed him on the ground. After handcuffing him, the captain punched the prisoner again, snapping the prisoner's head against the floor. The prisoner died later that day of blunt force trauma.

### The Widespread History of Excessive Force at Limestone

74.     The use of excessive force at Limestone was also common, longstanding, and well-known among ADOC personnel, including all defendants. All the incidents described below occurred at Limestone.

75.     In October 2018, a prisoner reportedly having a mental-health crisis was screaming loudly. Two officers responded, sprayed him with a chemical agent, and rammed his head against a bed rail and a wall several times.

76. In 2019, an officer placed a prisoner in the takedown position as another officer kicked the prisoner's legs. The prisoner fell to the floor and hit his head. Officers sprayed the prisoner with a chemical agent and punched and kicked him. The prisoner suffered a traumatic brain injury and permanent hearing loss.

77. In October 2019, an officer sprayed a prisoner in a closed cell with a chemical agent. Another officer handcuffed the prisoner and removed him from his cell, then slammed the prisoner's head into a wall, knocking him unconscious. The prisoner suffered a laceration to his ear that required sixteen stitches.

78. In February 2021, a prisoner in a lockup cell attempted repeatedly to get officers' attention. Two times, officers sprayed a chemical agent into the prisoner's closed cell. Eventually, the officers handcuffed the prisoner and took him to the infirmary. On the way, one officer grabbed the prisoner by the back of the neck and slammed his head into a wall twice.

79. In February 2021, a prisoner asked an officer for his breathing treatment. The officer responded by spraying him with a chemical agent and hitting him. Later, the officer returned, placed the prisoner in handcuffs and leg restraints, and took him outside. There, the officer shoved the prisoner to the ground and beat him with a stick.

80. In March 2021, a prisoner and an officer got into a physical altercation. The prisoner was subdued, and his hands were cuffed behind his back. Several officers then beat the prisoner while a lieutenant watched.

81. In March 2021, a prisoner refused to comply with a lockdown order. An officer punched him in the face.

82. In February 2022, a prisoner asked for cleaning supplies to clean his cell. An officer punched him in the face.

83.    In August 2022, an officer beat a prisoner while the prisoner was trying to go to his job in the kitchen. The prisoner required four staples and six stitches in the back of his head.

84.    In April 2023, an officer hit a prisoner in the stomach with his baton. The officer then handcuffed the prisoner and slammed the prisoner's head into a wall.

85.    In August 2023, two officers beat a prisoner after they discovered him in a dorm he was not assigned to.

86.    In September 2023, two officers threw a prisoner to the ground and rubbed his face into the gravel; the prisoner was handcuffed and in belly chains at the time.

### *The Supervisory Defendants Knew of the Frequent Use of Excessive Force Across the ADOC and at Limestone Specifically*

87.    By virtue of their positions in the ADOC, each of the Supervisory Defendants knew of the widespread history of excessive force across the ADOC and at Limestone specifically.

88.    As part of their job responsibilities, each of the Supervisory Defendants were required to: (a) review Limestone's use-of-force reports and investigations; (b) review and approve or disapprove the recommendations of subordinates' investigations of use-of-force incidents; and (c) be aware of trends related to use-of-force incidents, investigations, and associated employee discipline at Limestone.

89.    Each of the Supervisory Defendants were also responsible for ensuring that all of Limestone's correctional staff were adequately trained, supervised, and disciplined so that all correctional staff fulfilled their required duties of maintaining the safety and security of prisoners at Limestone.

90.    Each of the Supervisory Defendants were also responsible for being aware of Limestone's policies and practices related to use-of-force incidents and investigations at Limestone, and they each had the duty, ability, and authority to suggest or require modifications

to Limestone's policies and practices and to implement or supervise such changes as necessary to address any associated issues and thereby minimize the frequency of excessive-force incidents at Limestone.

91.     Additionally, because of each of the Supervisory Defendants' positions within the ADOC, each Supervisory Defendant was aware of the content and findings of the DOJ's July 2020 Report, including its finding that "Alabama does not properly prevent and address unconstitutional uses of force in its prisons, fostering a culture where unlawful uses of force are common."[8]

### *The Supervisory Defendants Failed to Respond Reasonably to Address the Frequent Use of Excessive Force at Limestone*

92.     By virtue of their positions in the ADOC, each Supervisory Defendant had the ability and authority to reduce the frequency with which correctional officers at Limestone engage in excessive force. Nevertheless, each of the Supervisory Defendants failed to take reasonable action to do so.

93.     Each Supervisory Defendant had the authority and ability to create and enforce policies and procedures at Limestone that would have minimized correctional officers' use of excessive force within Limestone. For example, each Supervisory Defendant had the duty, ability, and authority to suggest or require modifications to existing policies and practices at Limestone, and each Supervisory Defendant could have used that authority and ability to suggest or require the addition of policies that decreased correctional officers' uses of excessive force and/or the deletion of policies that led correctional officers to engage in excessive force with impunity. However, none of the Supervisory Defendants suggested or required such modifications to existing policies.

---

[8] July 2020 Report at 3.

94.     Additionally, each Supervisory Defendant had the duty, ability, and authority to supervise, train, and/or discipline correctional officers in ways that would have reduced the incidence of excessive force at Limestone. Each Supervisory Defendant could have done so either directly, by supervising, training, and/or disciplining an offending correctional officer him- or herself, or indirectly, by either (a) instructing the Supervisory Defendant's subordinate or subordinates to supervise, train, and/or discipline an offending correctional officer; or (b) suggesting, implementing, and/or enforcing policies and practices that resulted in the supervision, training, and/or discipline of correctional officers who engaged in excessive force.

95.     Supervisory Defendants nevertheless failed—both individually and collectively— to take the above or any other reasonable corrective action to reduce the use of excessive force by correctional officers at Limestone.

96.     Each of these failures described above, as well as other failures by Supervisory Defendants that are yet unknown, caused Plaintiff to be subjected to excessive force by Defendants Cobb and Dial.

### CAUSES OF ACTION
### COUNT I
#### VIOLATION OF THE EIGHTH AMENDMENT – EXCESSIVE FORCE
#### Against Defendants Cobb and Dial

97.     Plaintiff incorporates by reference Paragraphs 1–7 and 16–50 of this Complaint.

98.     As Senior Correctional Officers, Defendants Cobb and Dial were responsible for ensuring the safety and security of all prisoners at Limestone, including Plaintiff.

99.     Instead, Defendants Cobb and Dial used excessive, unnecessary, and unlawful force against Plaintiff when they beat him unconscious and continued to beat him after he lost consciousness, even though Plaintiff posed no threat, as described more fully above.

100. In beating Plaintiff, Defendants Cobb and Dial acted maliciously and sadistically with the intent to cause harm; not in a good-faith effort to maintain or restore discipline. These motives are made clear by, among other reasons: (a) Plaintiff complied with all of Defendants Cobb's and Dial's instructions; (b) Plaintiff never gave any verbal or physical indication that he intended to resist or oppose Defendants Cobb or Dial; (c) even when Defendants Cobb and Dial began to beat Plaintiff, Plaintiff did not exhibit any physical or verbal resistance to Defendants Cobb and Dial; and (d) Defendants Cobb and Dial continued to beat Plaintiff after Plaintiff was unconscious and, thus, physically incapable of displaying any physical or verbal resistance.

101. As a direct and proximate result of Defendants Cobb's and Dial's use of excessive force, Plaintiff suffered serious physical injury; ongoing hearing, memory, and vision loss; neurological symptoms; difficulty walking; and emotional distress, including anxiety, flashbacks, and nightmares.

## COUNT II
### VIOLATION OF THE EIGHTH AMENDMENT – SUPERVISORY LIABILITY
**Against the Supervisory Defendants**

102. Plaintiff incorporates by reference Paragraphs 1–96 of this Complaint.

103. Through the actions described in Paragraphs 16–50 above, Defendants Cobb and Dial violated Plaintiff's clearly established Eighth Amendment rights when they beat him unconscious and continued to beat him after he had lost consciousness, even though Plaintiff posed no threat at all.

104. By virtue of their positions within the ADOC, including their duties, responsibilities, ranges of knowledge, and domains of authority, as described more fully and specifically as to each Supervisory Defendant in Paragraphs 8–15 and 51–91 above, each Supervisory Defendant knew of the widespread history of correctional officers' uses of excessive

force against prisoners at Limestone and nevertheless failed to take any corrective action to minimize such uses of force.

105.    By virtue of their positions within the ADOC, as described more fully and specifically for each Supervisory Defendants in Paragraphs 8–15 and 92–96 above, each Supervisory Defendant had the authority and ability to take corrective action that would have minimized the use of excessive force against prisoners at Limestone, but each Supervisory Defendant nevertheless failed to take any corrective action to minimize such uses of force.

106.    As a result of each Supervisory Defendants' failures described above, Plaintiff was seriously physically injured, and he continues to experience ongoing physical and emotional distress, including hearing, memory, and vision loss; neurological symptoms; difficulty walking; and anxiety, flashbacks, and nightmares.

## COUNT III
### STATE LAW NEGLIGENCE
**Against Defendants Cobb and Dial**

107.    Plaintiff incorporates by reference Paragraphs 1–7 and 16–50 of this Complaint.

108.    Because of their professional roles, Defendants Cobb and Dial owe a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

109.    Defendants Cobb and Dial breached the standard of care they owe to Plaintiff by maliciously and sadistically, with the intent to cause harm and not in a good-faith effort to maintain or restore discipline: (a) hitting and kicking Plaintiff repeatedly (b) beating Plaintiff with a broom handle until he was unconscious, and (c) continuing to beat Plaintiff after he lost consciousness, even though Plaintiff never gave resisted, opposed, or gave any indication that he posed a danger to Defendants Cobb or Dial or anyone else.

24

110.    As a direct and proximate result of Defendants Cobb's and Dial's breach of the duty of care they owe to Plaintiff, Plaintiff was seriously physically injured, and he continues to experience ongoing physical and emotional distress, including hearing, memory, and vision loss; neurological symptoms; difficulty walking; and anxiety, flashbacks, and nightmares.

111.    The risks and harms that Defendants Cobb and Dial caused Plaintiff are within the scope of protection afforded by the duties Defendants Cobb and Dial owe to Plaintiff.

### COUNT IV
#### STATE LAW NEGLIGENCE
**Against the Supervisory Defendants**

112.    Plaintiff incorporates by reference Paragraphs 1–96 of this Complaint.

113.    Because of their professional roles, all Supervisory Defendants owe or owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

114.    Supervisory Defendants breached the standard of care they owe or owed to Plaintiff by failing to take those reasonable actions that Supervisory Defendants had the authority and ability to take to reduce the reduce the frequency with which correctional officers at Limestone engaged in excessive force.

115.    Supervisory Defendants' abilities and authorities are described more fully in Paragraphs 8–15 above. Supervisory Defendants' failures to take reasonable action are described more fully in Paragraph 92–96 above.

116.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Defendants Cobb and Dial beat Plaintiff maliciously and sadistically, with the intent to cause harm and not in a good-faith effort to maintain or restore discipline by: (a) hitting and kicking Plaintiff repeatedly (b) beating Plaintiff with a broom handle until he was

25

unconscious, and (c) continuing to beat Plaintiff after he lost consciousness, even though Plaintiff never gave resisted, opposed, or gave any indication that he posed a danger to Defendants Cobb or Dial or anyone else.

117.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Plaintiff was seriously physically injured, and he continues to experience ongoing physical and emotional distress, including hearing, memory, and vision loss; neurological symptoms; difficulty walking; and anxiety, flashbacks, and nightmares.

118.    The risks and harms that the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owe to Plaintiff.

### COUNT V
#### STATE LAW WANTONNESS
**Against Defendants Cobb and Dial**

119.    Plaintiff incorporates by reference Paragraphs 1–7 and 16–50 of this Complaint.

120.    Because of their professional roles, Defendants Cobb and Dial owe a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

121.    Defendants Cobb and Dial breached the standard of care they owe to Plaintiff by maliciously and sadistically, with the intent to cause harm and not in a good-faith effort to maintain or restore discipline: (a) hitting and kicking Plaintiff repeatedly (b) beating Plaintiff with a broom handle until he was unconscious, and (c) continuing to beat Plaintiff after he lost consciousness, even though Plaintiff never gave resisted, opposed, or gave any indication that he posed a danger to Defendants Cobb or Dial or anyone else.

122.    Defendants Cobb's and Dial's breach of the duty they owe to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals incarcerated in Limestone.

123.    As a direct and proximate result of Defendants Cobb's and Dial's breach of the duty of care they owe to Plaintiff, Plaintiff was seriously physically injured, and he continues to experience ongoing physical and emotional distress, including hearing, memory, and vision loss; neurological symptoms; difficulty walking; and anxiety, flashbacks, and nightmares.

124.    The risks and harms that Defendants Cobb and Dial caused Plaintiff are within the scope of protection afforded by the duties Defendants Cobb and Dial owe to Plaintiff.

## COUNT VI
### STATE LAW WANTONNESS
**Against the Supervisory Defendants**

125.    Plaintiff incorporates by reference Paragraphs 1–96 of this Complaint.

126.    Because of their professional roles, all Supervisory Defendants owe or owed a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone, including Plaintiff.

127.    Supervisory Defendants breached the standard of care they owe or owed to Plaintiff by failing to take those reasonable actions that Supervisory Defendants had the authority and ability to take to reduce the reduce the frequency with which correctional officers at Limestone engaged in excessive force.

128.    Supervisory Defendants' abilities and authorities are described more fully in Paragraphs 8–15 above. Supervisory Defendants' failures to take reasonable action are described more fully in Paragraph 92–96 above.

129.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Defendants Cobb and Dial beat Plaintiff maliciously and sadistically, with the intent to cause harm and not in a good-faith effort to maintain or restore discipline by: (a) hitting and kicking Plaintiff repeatedly (b) beating Plaintiff with a broom handle until he was

unconscious, and (c) continuing to beat Plaintiff after he lost consciousness, even though Plaintiff never gave resisted, opposed, or gave any indication that he posed a danger to Defendants Cobb or Dial or anyone else.

130.    The Supervisory Defendants' breach of the duty they owe to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals incarcerated in Limestone.

131.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Plaintiff was seriously physically injured, and he continues to experience ongoing physical and emotional distress, including hearing, memory, and vision loss; neurological symptoms; difficulty walking; and anxiety, flashbacks, and nightmares.

132.    The risks and harms that the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owe to Plaintiff.

## COUNT VII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendants Cobb and Dial

133.    Plaintiff incorporates by reference 1–7 and 16–50 of this Complaint.

134.    Defendants Cobb's and Dial's actions, as fully described above, were both extreme and outrageous.

135.    Through their actions, Defendants Cobb and Dial intended to cause, or acted in reckless disregard of the probability that they would cause, severe emotional distress to Plaintiff.

136.    Defendants Cobb's and Dial's actions, as fully described above, were undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights, and with the very intention of causing harm.

137.    As a direct and proximate result of Defendants Cobb's and Dial's actions, Plaintiff suffered actual, foreseeable, and intended harm, as described in this Complaint, including serious

28

physical injury; ongoing hearing, memory, and vision loss; neurological symptoms; difficulty walking; and emotional distress, including anxiety, flashbacks, and nightmares

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a.      Find in favor of Plaintiff on all counts;

b.      Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

c.      Award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial;

d.      Award Plaintiff recovery of attorneys' fees and other costs; and

e.      Award any other relief the Court deems appropriate.

Respectfully submitted this 20th day of October 2025.

*/s/ Susanne Emily Cordner*
Susanne Emily Cordner
(ASB-4687-C61N)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*